Shu-Chen Kuo,
    *Plaintiff*,

    *v.*

Winklevoss Consultants, Inc.,
    *Defendant*.

Civil No. 3:16cv651 (JBA)

September 26, 2018

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Shu-Chen Kuo alleges against her employer, Defendant Winklevoss Consultants, Inc. ("Winklevoss Consultants"), discrimination in violation of Title VII based on race and national origin (Count One), race discrimination in violation of 42 U.S.C. § 1981 (Count Two), race and national origin discrimination in violation of the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §§ 46-60(a) et seq. (Count Three), and retaliation in violation of Title VII, Section 1981, and CFEPA (Counts Four, Five, and Six). Defendant moves for summary judgment on all counts. For the following reasons, Defendant's Motion for Summary Judgment [Doc. # 50] is GRANTED.

## I. Background

Defendant Winklevoss Consultants is owned by Howard Winklevoss, who also owns, or is a partner in, several other entities including Winklevoss Technologies, Winklevoss Insurance Agency and the Saugatuck Rowing Club. (Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 50-14] ¶ 5; Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 52-1] ¶ 5.)[1] Winklevoss has final say in virtually all affairs of his businesses and is actively engaged in management decisions of Winklevoss Consultants, including all things

---

[1] Where Plaintiff admits facts asserted in Defendant's Local Rule 56(a)1 Statement, the Court refers to both Plaintiff and Defendant's local rule statements together as "LR 56 Stmt."

regarding employee compensation, as well as involvement in hirings and firings. (Ex. 1 (Winklevoss Dep.) to Plaintiff's Mem. in Opp'n to Def.'s Mot. [Doc. # 52-3] at 21:5-22:20.)

Plaintiff was born in Taiwan, is Taiwanese, and is a permanent resident of the United States. (LR Stmt. ¶ 4) Plaintiff was hired by Mark Lockwood and began her employment with Winklevoss Consultants on November 7, 2005 as a Senior Accountant.[2] (*Id.* ¶¶ 1-2.) The accounting department in which Plaintiff was employed services all of the Winklevoss entities. (*See* Winklevoss Dep. at 19:15-18.) Mr. Lockwood was the manager of the department. (LR 56 Stmt. ¶ 6.)[3] Plaintiff was the only Asian employee of Winklevoss Consultants; there were one or two Asian employees at Winklevoss Technologies whom Kuo could recall, but Kuo was the only Asian employee in the department reporting to Lockwood. (Ex. 4 to Pl.'s Opp'n (Pl.'s Dep.) [Doc. # 52-6] at 149-50.)

Plaintiff assisted Mr. Lockwood in his position of Controller and provided accounting support to several Winklevoss entities, including preparing financial statements, completing bank reconciliations, and working closely with accounts payable and accounts receivable. (*Id.*) In 2014 and 2015, the accounting group consisted of Lockwood, Plaintiff, Jenifer Neubauer, and Katherinne Gonzales. (Pl.'s Dep. at 50:4-51:11; Winklevoss Dep. at 23:1-17.) Sarah Connolly also worked in the office as the receptionist, performing administrative and data entry duties and assisting with basic accounting work. (LR 56 Stmt. ¶ 10.)

---

[2] At the time of her hire, Plaintiff was paid an annual salary of $60,000. She was entitled to two weeks of vacation for the first 12 months of her employment and three weeks of vacation in each year thereafter. (LR 56 Stmt. ¶ 3.)

[3] In 2007 or 2008 Plaintiff was promoted to Assistant Controller, but she did not receive any pay raise associated with the promotion. (Pl.'s Dep. at 54:19-55:4.)

### A. Performance Reviews

Lockwood completed reviews of employees every February. (Ex. 3 to Pl.'s Opp'n (Lockwood Dep.) [Doc. # 52-5] at 50:16-18.) Throughout her tenure, Plaintiff always received ratings of "Meets Expectations," "Exceeds Expectations," and "Outstanding" in all of her annual reviews. (*See* Ex. 13 (Pl.'s Performance Reports) to Pl.'s Opp'n [Doc. # 52-8].)

In Kuo's first review, covering her first six months, she was rated a 4 out of 5 (Exceeds Expectations), with comments by Lockwood that Kuo had "taken the ball and run with it for both Winklevoss, LLC and Saugatuck Rowing, LLC." (*See id.* at DEF0000112; Lockwood Dep. at 49:19-50:12.) In her 2006 annual review, Kuo received another 4 out of 5, this time with Lockwood noting that she is a "valued member of the finance team," "exhibits an uncanny work ethic," and that "her ability to learn on the fly and follow instructions is exemplary." (Pl.'s Performance Reports at DEF000041.)

Jenifer Neubauer was hired in 2007. (Lockwood Dep. at 53:23-25; Ex. 5 (Neubauer Dep.) to Def.'s Mot. [Doc. # 50-6] at 8:5-6.) Neubauer started as a Senior Accountant reporting to Lockwood. Lockwood looked at Neubauer and Kuo as peers, performing the same duties, and while Kuo's title was higher, he considered them to have the same duties and responsibilities. (Lockwood Dep. at 31-33.)

Plaintiff again received a 4 out of 5 in her 2007 review, but the comments indicate she should "stop talking to other members of the staff regarding her compensation" and "[a]ny concerns on compensation need to be discussed with her Manager." (Pl.'s Performance Reports at DEF000039; Lockwood Dep. at 54:4-55:17.) Lockwood then crossed out the word "compensation" in each instance above, and hand wrote in "accounting issues" instead, apparently at Plaintiff's request. (Lockwood Dep. at 54:3-19.) In that evaluation, Lockwood stated that Plaintiff "should

work on how to communicate more effectively while taking into consideration the level of knowledge of non accounting personnel," noting that "[d]uring the year [they] had a couple of short meetings on communication with another employee which involved this very Management concept." (Pl.'s Performance Reports at DEF000039-40.) The evaluation also noted that "[h]er ability to assimilate to her job responsibilities may not be the same ability others possess." (*Id.* at DEF000040.)

Plaintiff received only 3 out of 5 ("Meets Expectations") in both her 2008 and 2009 reviews. (Pl.'s Performance Reports at DEF000037, 35.) The 2008 review says that her "emails need to be better written" and that "[s]ometimes they are hard to follow," noting that "[g]iven the critical nature of communication in Finance, it is important that we strive to communicate effectively . . . ." (*Id.* at DEF000037.) In 2010, Plaintiff received a 4 out of 5, (Ex. 16 to Def.'s Mot. (Pl.'s Performance Reports) [Doc. # 50-8] at Kuo 00181), followed by reviews of 5 out of 5 (Outstanding) for 2011, 2012, and 2013 (Lockwood Dep. at 57-58; Pl.'s Performance Reports at DEF000029-33). Despite the Outstanding ratings, Plaintiff's 2012 and 2013 reviews reference her need to "author emails that are clear and contain better grammar," reiterating that "[s]olid grammar is critical to our performance and hard to follow emails make it difficult." (*Id.* at DEF000030 and 32.) Although Plaintiff's 2014 review was a 5 out of 5, the report noted that Plaintiff "needs to author emails that are clear and contain better grammar," among other comments. *Id.* at DEF000028.) The 2014 review is not signed by Plaintiff. (*Id.*) Lockwood testified that he tried to review it with Plaintiff but she "got upset." (Lockwood Dep. at 59).

Neubauer's reviews for her first two years (2007 and 2008), also done by Lockwood, were 3 out of 5 (Meets Expectations) and 4 out of 5 (Exceeds Expectations). (Ex. 17 (Neubauer's Performance Reports) to Pl.'s Opp'n [Doc. # 52-9] at DEF001132, 37.) Neubauer's later reviews

include one 4 out of 5 in 2009 but are then all 5 out of 5 (Outstanding) every year from 2010 to 2015, the year of Kuo's termination. (Ex. 17 (Neubauer's Performance Reports) to Def.'s Mot. for Summ. J [Doc. # 50-8].)

## B. Compensation

Marie Antonelli is the "office manager" for all of the Winklevoss companies, and also holds the title of vice-president and secretary of Winklevoss Consultants. (Ex. 2 (Antonelli Dep.) to Pl.'s Opp'n [Doc. # 52-4] at 15:3-16:14; Ex. 6 (Website) to Pl.'s Opp'n [Doc. # 52-8].) She is also in charge of human resources ("HR") for all of the Winklevoss companies, but uses ADP TotalSource ("ADP"), an outside group, to assist with HR, including running the payroll and serving in an advisory capacity with respect to investigations and complaints. (Antonelli Dep. at 17:19-19:17.)

Antonelli and Lockwood together make recommendations for raises and bonuses based on the salary raise range set by Winklevoss Technologies for all of the Winklevoss companies, and on how an employee performed the prior year. (Antonelli Dep. at 20:22-25:7.) But the ultimate decisions came from Winklevoss without his direct consideration of the employees' reviews/performance.[4] (Winklevoss Dep. at 27:13-28:1, 46:5-6; Ex. 8 (Salary/Bonus Recommendations) to Pl.'s Opp'n [Doc. 52-8]; Lockwood Dep. at 50:21-51:24.)

Winklevoss testified that he had little knowledge of or interaction with Plaintiff during her nine-year tenure at his company and that "fairness" was not a factor in making raise and/or bonus determinations. (Winklevoss Dep. at 45:4-46:13.) When determining the raise or bonus for

---

[4] Winklevoss testified that he had never looked at any of the reviews for Kuo or Neubauer. (Winklevoss Dep. at 27:4-12; 67:9-11.)

employees in similar jobs, Winklevoss makes his decisions on a "subjective" basis, with no set criterion, based on saving money and whatever he decides "at the moment." (*Id.* at 46:14-47:9.)

Plaintiff's pay increase and bonus for each year were as follows:[5]

| Year | Salary | Increase at Year-End | Bonus at Year-End | Review at Year-End |
|------|--------|----------------------|-------------------|--------------------|
| 2005 (from hire in November) | $60,000 | Disputed | unknown | 4/Exceeds Expectations (rating period ending May 7, 2006) |
| 2006 | Disputed[6] | Disputed[7] | $5,000 | 4/Exceeds Expectations |
| 2007 | $77,000 | $5,500 | $9,586.50 | 4/Exceeds Expectations |
| 2008 | $82,500 | $3,300 | $8,250 | 3/Meets Expectations |
| 2009 | $85,800 | $3,432 | $6,864 | 3/Meets Expectations |
| 2010 | $89,232 | $4,700 | $2,500 | 4/Exceeds Expectations |
| 2011 | $93,932 | $5,200 | $9,000 | 5/Outstanding |
| 2012 | $99,132 | $5,000 | $9,500 | 5/Outstanding |
| 2013 | $104,132 | $3,200 | $9,500 | 5/Outstanding |
| 2014 | $107,332 | $2,500 | $5,000 | Not marked[8] |

---

[5] *See* LR 56 Stmt. ¶¶ 3, 32. The parties disagree as to the exact progression of Plaintiff's salary, though they appear to agree that she began employment in November 2005 at a salary of $60,000 and had reached $77,000 by 2007. (Def.'s and Pl.'s LR 56 Stmts. ¶ 32.) Plaintiff denies the rest of Defendant's salary chart (regarding 2007-2015), but the evidence she submitted confirms the information in that chart. (*See* Pl.'s Performance Reviews at DEF000039, 37, 35, 33, 31, 29, 27.)

[6] Compare Def.'s LR Stmt. ¶ 32 (listing Plaintiff's 2006 salary as $70,000) with Pl.'s Performance Reviews at DEF000112 (recommending a salary increase to $65,000 in May 2006).

[7] The parties dispute the 2006 year-end increase (compare Def.'s LR Stmt. ¶ 32 (listing 2007 increase as $5,500) with Pl.'s Performance Reviews at DEF000041 (noting that Plaintiff had "just received an increase in September 2006" and therefore recommending an increase of $2,000). The parties therefore agree that, by the start of 2007, Plaintiff's salary had increased to $77,000.

[8] Defendant's LR Statement indicates that Plaintiff received only a "meets expectations," but in fact there is no overall evaluation checked off on this report. Plaintiff did receive

| | | | | |
|---|---|---|---|---|
| 2015 | $109,832 | | | |

Neubauer's pay increase and bonus for each year were as follows:[9]

| Year | Salary | Increase | Bonus | Review |
|---|---|---|---|---|
| 2007 | $68,000 | 4,800 | unknown | 3/Meets Expectations |
| 2008 | $72,800 | $2,912 | $7,280 | 4/Exceeds Expectations |
| 2009 | $75,712 | $5,300 | $7,571 | 4/Exceeds Expectations |
| 2010 | $81,012 | $9,000 | $2,500 | 5/Outstanding |
| 2011 | $90,012 | $5,000 | $9,000 | 5/Outstanding |
| 2012 | $95,012 | $6,000 | $9,000 | 5/Outstanding |
| 2013 | $101,012 | $5,050 | $10,000 | 5/Outstanding |
| 2014 | $105,062 | $6,400 | $10,000 | 5/Outstanding |
| 2015 | $111,462 | | | |

Neubauer testified her offer letter stated that "based on [her] performance and the performance of the company," she would receive a 10% bonus every year, but that no one ever "guarantee[d]" her a bonus. (Neubauer Dep. at 44:23-45:4.) She testified that she "may have" told Ms. Kuo that this was in her offer letter, but that she "never" said that the bonus was "guaranteed." (*Id.* at 45:13-21.) As reflected above, Neubauer did receive a bonus of between approximately 9.5%

_____

three "Meets Expectations" and one "Outstanding" on the four individual evaluation criteria in 2014. (Ex. 13 to Pl.'s Opp'n at DEF000027.)

[9] *See* LR 56 Stmt. ¶ 33; Neubauer's Performance Reports at DEF001137, 32. Plaintiff claims that Ms. Neubauer received $65,000 in 2007, "with raises of over $15,000 before 2009." Pl.'s LR Stmt. ¶ 33. Plaintiff also claims that Ms. Neubauer received "Meets Expectations" in 2007 and 2008. (*Id.* ¶ 34.) However, Plaintiff's own exhibits reflect the information contained in the chart above.

and 10% each year except 2010, when her tuition was paid and therefore her bonus reduced (see below). Between 2007 and 2013, Plaintiff's bonuses ranged between 8% and approximately 12.5% (according to the chart above) except 2010, when her tuition was also paid and therefore her bonus reduced. In 2014, Plaintiff received an approximately 4.6% bonus.

Plaintiff testified that her compensation was discriminatory because Neubauer received higher raises and bonuses, in terms of percentage of salary, each year. (Pl.'s Dep. at 157:23-158:4 ("Every year they would give Jenifer more raises, more bonus in terms of percentage, and I get two percent. And even I have outstanding performance like Jenifer, but she still get 10 percent. I get something, maybe 8 percent to 9.").)

### C. Vacation

According to her offer letter, Plaintiff was entitled to two weeks of vacation for the first 12 months of her employment and three weeks of vacation in each year thereafter. (Pl. Dep. at 23-24; Ex. 2 (Employment Offer Letter) to Def.'s Mot. [Doc. # 50-5].) Lockwood testified that the company updated its vacation policy in 2012, and under the new policy employees initially received three weeks of vacation, increasing to four weeks after five years of employment. (Lockwood Dep. at 68:1-69:24; Ex. 11 (Updated Employee Policies Email) to Def.'s Mot. [Doc. # 50-7].) Although this policy change did not occur until 2012, Plaintiff claimed she was entitled to four weeks' vacation time beginning in 2010, her fifth year at the company.[10]

Mr. Lockwood never denied Plaintiff's requests to use vacation time. (Pl.'s Dep. at 186-88, 190-91, 195.) He repeatedly agreed to allow Plaintiff to take extended three week vacations to

---

[10] Plaintiff appears to dispute the year of the policy change, but she provides no specifics or evidence demonstrating a different date, and the email with "updated employee policies," which included this vacation policy, was circulated in February 2012. (Updated Employee Policies Email.)

Taiwan, which was difficult on the accounting group. (*Id.* at 184-86.) In 2010, Mr. Lockwood allowed Plaintiff to take a four week vacation by combining personal days and making up other days. (*Id.* at 190-91; Ex. 13 (Email re: vacation time) to Def.'s Mot. [Doc. # 50-7].)

Neubauer was entitled to three weeks of vacation until 2012, when the policy changed to provide four weeks of vacation after five years of employment. (Neubauer Dep. at 23-24.) Neubauer was hired in 2007, so she did not reach five years of employment until 2012. Like Plaintiff, Neubauer was not entitled to four weeks of vacation time in 2010 or 2011. (*Id.* at 23.)

### D.  Working from Home

At some point in 2009 or 2010, Neubauer began working from home several days a week. (Neubauer's Dep. at 18.) When Plaintiff later asked Lockwood if she could also work some days from home, she was given permission to do so. (Pl.'s Dep. at 85:10-13.) The at-home schedule changed week-to-week, and Neubauer and Plaintiff worked it out between themselves. (Neubauer Dep. at 38:8-21; Lockwood Dep. at 62:22-63:5.) Plaintiff let Neubauer pick her days first and then took the remaining days and said she was "very happy" with this arrangement. (*Id.* at 85:17-20, 87:17-18.) Plaintiff did not initially complain that Ms. Neubauer picked her days first or ask to change the procedure. (LR 56 Stmt. ¶ 13.)

In approximately April 2013, Plaintiff complained that Ms. Neubauer always picked her work-from-home days first, and in response, Mr. Lockwood suggested that they agree to a schedule and rotate who picked days first. (LR 56 Stmt. ¶ 16.) This system remained in place until Ms. Gonzales was hired in November 2014, at which point the three employees rotated the order of who picked work-from-home days first. (Neubauer Dep. at 39-41; *see also* Ex. 10 (Working From Home Emails) to Def.'s Mot. [Doc. # 50-7].) Although the work-from-home days were entered

into a calendar to which Lockwood had access, he testified that he "very rarely" looked at the calendar to see whether the arrangement was fair. (Lockwood Dep. at 66:21-67:1.)

Plaintiff testified that the work-from-home arrangement constituted "unfair treatment" related to how "management" treated her. (Pl.'s Dep. at 159-60.) Plaintiff asserted that the arrangement was unfair because Ms. Neubauer worked from home three or even four days per week, while Plaintiff only worked from home two days per week. (Pl.'s Dep. at 87:8-9.) Ms. Neubauer testified that she generally worked from home two days per week, although she recognized that at times she worked from home more often. (Neubauer Dep. at 18:8-19:7). In describing the schedule, Plaintiff noted that "we work from home two or three days. . . ." (Pl.'s Dep. at 28:23-25.) Plaintiff's calendar excerpt shows one week where Neubauer worked from home three days and three weeks where both Plaintiff and Neubauer worked from home two days per week. (*See* Ex. 65 (Work Calendar) to Pl.'s Opp'n, [Doc. # 52-13].)

### E. Tuition and Reimbursements

Defendant reimbursed Plaintiff for tuition and other expenses for accounting and other classes at Sacred Heart University, Pace University, and the University of Connecticut which Plaintiff needed in order to have enough accounting credits to take the Certified Public Accountant exam. (Pl.'s Dep. at 167:2-170:25.) Defendant paid all tuition reimbursement requests submitted by Plaintiff. (*Id.* at 170.) In 2010, the company reduced Plaintiff's bonus to $2,500 as a result of significant tuition reimbursement payments. (*See* Ex. 14 (Pl.'s 2010 Performance Report) to Def.'s Mot. [Doc. # 50-7].) In 2009 and 2010, Defendant reimbursed Plaintiff for $16,192 in schooling expenses. (*Id.*)

In addition to tuition reimbursement, Defendant also assisted Plaintiff in obtaining her Certified Public Accountant qualification beginning in 2008 or 2009 by paying for Plaintiff's

examination fee, textbooks, and review classes. (LR 56 Stmt. ¶ 27.) During Plaintiff's employment, Defendant paid all expenses Plaintiff submitted in connection with the CPA exam. (LR 56 Stmt. ¶ 28.) Plaintiff has not completed the multi-part CPA exam.

Defendant reimbursed Neubauer for tuition and other educational expenses in connection with obtaining a master's degree in internet technology at Pace University. (Neubauer Dep. at 11-12.) Like Plaintiff, Neubauer's 2010 bonus was also reduced to $2,500 due to tuition reimbursement payments. (*Id.* at 37-38; Ex. 15 (Neubauer 2010 Performance Report) to Def.'s Mot. [Doc. # 50-7].) Unlike Plaintiff, the company denied Neubauer's requests for reimbursement of expenses related to the CPA exam, and Neubauer paid the examination fee and the cost of review classes herself. (Neubauer Dep. at 11:24-12:25; Neubauer 2010 Performance Report.)[11] Neubauer passed the CPA exam in 2010. (Neubauer Dep. at 11:24-25; Pl.'s Dep. at 165; Neubauer 2010 Performance Report.)

### F. Plaintiff's Complaints

Antonelli testified that Plaintiff had a "common complaint . . . for years" that she thought she was not being treated fairly vis-à-vis Neubauer regarding allocation of vacation time, time allowed to work from home, and pay and raises. (Antonelli Dep. at 51:4-16.) Antonelli observed that Plaintiff "was obsessed with those three items." (*Id.*)

Mr. Winklevoss was aware that Kuo expressed concerns that her vacation entitlement was not equal to Neubauer's but did nothing in response to these concerns. (Winklevoss Dep. at 30:16-25.) He did not know if Plaintiff received the same amount of vacation as other employees. (*Id.* at

---

[11] Plaintiff disputes these based on her belief that Neubauer was reimbursed for CPA review classes but does not provide any evidentiary support for that belief. (Pl.'s Dep. at 62:13-14; 167:24-25.)

31:6-8.) He was also aware that Kuo had issues regarding Neubauer working from home but that he did not "know the details" and never tried to investigate. (*Id.* at 52.) Antonelli never did any investigation as to whether Neubauer took more work-from-home days or vacation days than Kuo. (Antonelli Dep. at 58.)

Plaintiff complained repeatedly to Lockwood that she was not being treated fairly in comparison to Neubauer and, after she was hired in 2014, Gonzalez. (Lockwood Dep. at 73-74.) Plaintiff did not reference her race or nationality but stated she was being treated differently than the others and alleged "favoritism." (Pl.'s Depo at 64-67, 69, 77-78.) Specifically, in late January 2015, Kuo and Lockwood discussed vacation time, and Kuo again expressed how unhappy she was with the situation and that she was unfairly not being treated the same as Neubauer. (Lockwood Dep. at 87-88.)

In response to Plaintiff's January 2015 complaints, Lockwood completed a Counseling Record, dated 1/29/15. (*See* Ex. 33 (Counseling Record) to Pl.'s Opp'n [Doc. # 52-10]; Lockwood Dep. at 101-105; Antonelli Dep. at 57-58.) Lockwood wrote:

> You need to focus on the responsibilities of the position and provide regular monthly financial reports in a timely manner . . . You are too focused on how they perceive other members of the staff are treated and you need to re-focus on your own responsibilities and meeting deadlines. . . . You, at times, come across abrasive and accusational to other members of the staff when making requests and you need to make a concerted effort to tone it down. We are all members of a team working toward the same goal. . . . You need to listen to other members of the staff to understand issues other staff members encounter to effectively come up with a solution. . . . This position requires the ability to . . . work with other members of the staff to assist and share information where necessary . . . You must get better at learning to listen to other members of the staff you are working with and try to understand things from their perspective . . . Working with other members of the staff is an integral part of your job and communication is key.

(1/29/15 Counseling Record at 1-2.) Lockwood also suggested, among other things:

> Improving communication by taking English classes to be reimbursed by the company[,] . . . continu[ing] to be an integral part of the Accounting function by focusing on your responsibilities and not on other employees[,] . . . [and] [m]aintaining open communication with other staff members when working to reconcile intercompany transactions in an amicable way as a member of a team effort."

(*Id.* at 2.) This Counseling Record was signed by Lockwood on February 6, 2015, which he testified was "probably when he tried to get Shu to sit down and go over this." (Lockwood Dep. at 105.) The Record is not signed by Plaintiff.

Shortly thereafter, Antonelli recommended that Plaintiff receive less than half the bonus (as a percentage of salary) of Ms. Neubauer.[12] (Antonelli Dep. at 48-49.) She testified that Lockwood told Antonelli that Plaintiff was not meeting the requirements of her job, and in February 2015 Antonelli wrote to Lockwood that Kuo "basically has not done her job." (Ex. 35 to Pl.'s Opp'n; Antonelli Dep. at 61:5-7.)

Plaintiff's 2014 review rates the quality of her work as "Outstanding," but Lockwood included in the review negative remarks about Kuo's language abilities and teamwork. (Pl.'s Performance Reports at DEF000027.).)

On February 5, 2015 Lockwood asked ADP what to do if Plaintiff became "belligerent or combative" in discussing a "Counselling document" with her. Lockwood inquired: "Is there anything we can do or do we need to give her an opportunity to cure her deficiencies?" (Ex. 32 (Emails with ADP) to Pl.'s Opp'n [Doc. # 52-10]; Lockwood Dep. at 93-95.) ADP recommended

---

[12] Antonelli testified that she and Lockwood had discussed the possibility of terminating Plaintiff as early as February 2015. (Antonelli Dep. at 55.)

remaining calm, "explain[ing] that her behavior is unacceptable in the work environment and if she displays any violent tendencies to ask her to leave or call the police." (Emails with ADP.)

On February 13, 2015, Plaintiff complained to Lockwood that she was receiving only a $2,500 raise and $5,000 bonus. (Ex. 34 (Email Lockwood to Antonelli) to Pl.'s Opp'n [Doc. # 52-10].) Kuo was upset and felt that it was not fair. (*Id.*; Lockwood Dep. at 107-109; Antonelli Dep. at 60-61.) She stated that she was not being treated with respect nor as well as the others in her group. (Lockwood Dep. at 100.) She complained that she did more work than Neubauer and others and again stated that she was not being treated fairly, specifically alleging "favoritism." (Pl.'s Dep. at 58:7-60:21.) She stated that she did not think it was right she was being picked on by the barrier imposed by the fact English is her second language, and that she felt she was being wrongly blamed for things. (Pl.'s Dep. at 60:8-22.) While she did not specifically mention race or national origin in this conversation with Lockwood, Plaintiff testified that the conversation was about her and Neubauer, and she is Asian while Neubauer is white and American. (*Id.* at 64:21-68:1, 77:15-78:18.)

On February 17, 2015, Mr. Lockwood composed another Counseling Record regarding Plaintiff. (*See* Ex. 20 (Counseling Record) to Def.'s Mot.; LR 56 Stmt. ¶ 46.) The language of the February 17 Counseling Record mirrors that of the Counseling Record dated January 29, 2015. (2/17/15 Counseling Record.) The February 17 Counseling Record is also not signed by Plaintiff, but Mr. Lockwood did meet with Plaintiff and deliver the Counseling Record to her. (LR Stmt. ¶ 46.)

Attached to the Counseling Record is a summary of a meeting from the following day (February 18, 2015). (Ex. 38 (Meeting Summary) to Pl.'s Opp'n.) The summary notes that Plaintiff "refused to sign" the earlier Counseling Record but did take a copy of the Record with her. (*Id.*) It reports that

initially the employee did not acknowledge the fact that her communications to other members of the staff needed to be toned down and continually said the issue was how the other employees interpreted her, with English being her second language. Employee was told that this is not conducive to a proper working environment and that she needs to learn to tone it down and not come across demeaning or accusational. Employee was offered English courses to be paid for by the Company to assist her with learning to communicate more effectively. Employee was told that working together cohesively was a requirement and that all employees need to treat each other with respect. Employee was reminded that she is the only one who is or has had issues working with any other members of the staff, either current or prior. Another member of the staff was brought into the meeting to describe how she believed she was talked to in a demeaning manner and in an embarrassing way and offered suggestions on how a more engaging and pleasant conversation would be better received. . . . Employee kept revisiting the past and did not seem to acknowledge the need to learn from the past and move forward. . . . The meeting concluded . . . with what appeared to be an understanding by the employee to move forward and not focus on what she perceived as unequal treatment.

(*Id.*) The summary ended with a description of the plan to "begin hosting monthly staff meetings . . . to meet and discuss any open issues and share information" and an upcoming department meeting "to clear the air and discuss the new 'moving forward' initiative and the importance of working together as a team." (*Id.*) Plaintiff testified that she had not seen this attachment before this suit, (Pl.'s Dep. at 97, 102-04), but saw the Counseling Record and felt it was unfair and refused to sign it, (Lockwood Dep. at 112; Kuo Dep. at 78-79).

While Lockwood testified that the Counseling Record was in reaction to Plaintiff's "performance issues," not her complaints, he testified that he "must not have remembered [the performance issues] at the time of the review," since they are not mentioned in Plaintiff's 2014 Performance Report. (Lockwood Dep. at 95-96.)

### G. Termination

1. *Plaintiff's History of Yelling at Lockwood*

Plaintiff sometimes raised her voice and yelled at Mr. Lockwood throughout a several year period. (Lockwood Dep. at 44-45, 82, 95.) For example, he testified, "She yelled frequently . . . [a]t me. I told her to tone it down." (Lockwood Dep. at 44.) Ms. Neubauer heard it. (Neubauer Dep. at 41.) Ms. Antonelli heard it. (Antonelli Dep. at 54-55.) Plaintiff admitted it. (Pl. Dep. at 90-95, 95-97.) Despite Mr. Lockwood's instructions to "tone it down," Plaintiff's conduct continued. (Lockwood Dep. at 44-45, 82, 95.)

Hank Freeman is a partner in Winklevoss Technologies. His office was a few doors down from Mr. Lockwood. (Pl. Dep. at 92-94; Winklevoss Dep. at 20; Lockwood Dep. at 83-86.) On January 22, 2015, Mr. Freeman heard Plaintiff yelling at Mr. Lockwood in his office. Her conduct was so egregious that Mr. Freeman called Mr. Lockwood and asked him to close his door. (Lockwood Dep. at 85.) Later, he sent Mr. Lockwood an email stating, "I was appalled at Shuchen's behavior yesterday, which everyone on our hallway couldn't help but hear. She was totally unprofessional and combative. Next time please close your door. You have a lot of patience, Mark, after that episode alone most managers would be looking to fire her." (Ex. 18 to Def.'s Mot.) Plaintiff also acknowledged that she raised her voice during this meeting with Mr. Lockwood but felt it was "not a problem." (Pl.'s Dep. at 95-97.)[13]

    *2. May 7, 2015 Meeting*

---

[13] Plaintiff testified she was upset at being picked on for her English and being treated differently and unfairly, with Neubauer being favored and so, when trying to defend herself, she would talk louder when they claimed not to understand her English. (Pl.'s Depo at 90-92.) "I complain about unfair treatment. I speak loudly." (*Id.* at 92.) "It was a small office and one or two times we [she and Lockwood] raised voices because I complain about I wasn't being treated very fair. I was being treated very unfair and unreasonable in a lot of incidents, and they are accusing me of something that is not my fault…." (*Id.* at 93.)

At the conclusion of a meeting on May 7, 2015, Ms. Antonelli went around the room and asked each person present if they had any concerns or anything they wanted to discuss. (LR 56 Stmt. ¶ 48.) An email Plaintiff received from Ms. Neubauer the week before concerning the work-from-home schedule and coverage at the office on Friday, May 1, 2015 was brought up.[14] (Antonelli Dep. at 82-83, 91-93.) Lockwood and the others at the meeting testified that Plaintiff lost her temper during this discussion. (Lockwood Dep. at 125:9-10; Neubauer Dep. at 33-34.)

Ms. Antonelli described the meeting as "[i]nsubordination, screaming, total chaos" with Plaintiff "screaming . . . her face was contorted, her arms were flying all over the place" as she pointed and waved her pencil at Ms. Neubauer. (Antonelli Dep. at 82.) The meeting was "traumatic" and Ms. Antonelli testified, "[I]n all my years of being involved in management and with people, I have never seen a situation like that." (*Id.* at 84.) Several others testified they were concerned for their and others' safety because of Plaintiff's behavior. (*See, e.g.*, Neubauer Dep. at 42-43; Lockwood Dep. at 128; Gonzalez Aff. ¶ 7.)

A Final Written Warning issued to Plaintiff on May 26, 2015 also discussed the May 7 meeting. (Ex. 22 (Final Written Warning) to Def.'s Mot. [Doc. # 50-9].) The Warning explained that management is not involved in creating the work-from-home schedule and discussed Plaintiff's behavior at the meeting. (*Id.*) It said that Plaintiff "continued to argue" with Antonelli "for several minutes" during the meeting, which was "not professional behavior." (*Id.*) "Instead of

_____

[14] As described in the email, there had been a mix-up about coverage at the Greenwich office on that date. As a result, Ms. Neubauer changed her schedule and came to the office so that someone from the accounting group was in the office. She did this because she was concerned that Mr. Winklevoss or Ms. Antonelli might be upset that no one was in the office and decide to revoke their privilege of working from home. (Neubauer Dep. at 28-32; *See* Ex. 21.)

communicating that you would be working from home as asked, you had an arguement [sic] with [] Maria [Antonelli]. You began to raise your voice and this is unacceptable office behavior." (*Id.*)

In contrast, Plaintiff testified that she was frustrated at the May 7 meeting but did not raise her voice, and that she offered to show what had in fact happened, but was cut off. (Pl.'s Dep. at 116-19.) Plaintiff notes that despite her allegedly threatening behavior, Antonelli could not recall if she ever had any follow-up discussions with anyone about the meeting. (Neubauer Dep. at 34.) Emails sent May 7 and 8, 2015 by Lockwood to Plaintiff and by Antonelli to Lockwood made no mention of any threatening conduct by Plaintiff, though they do reference "what happened yesterday" and in "the past." (*See* Ex. 41 (Pl.'s Aff) to Pl.'s Opp'n [Doc. # 52-10] ¶ 7.)

### 3. Additional Events Between May 7 Meeting and Termination

Lockwood and Antonelli began daily monitoring of Kuo on the days she worked from home, detailing in memos when Kuo signed in and out, which they never did with any other employees. (Lockwood Dep. at 138-40; Ex. 46 (Emails Re Pl.'s Hours) to Pl.'s Opp'n [Doc. # 52-11].)

On March 25, 2015, Neubauer emailed Lockwood and Antonelli, saying that Plaintiff made her feel "uncomfortable" as "[p]eople who feel they are treated unfairly can do some crazy things …." (Ex. 49 to Pl.'s Opp'n.) Neubauer asked Antonelli and Lockwood whether cameras in the parking lot would be set up so her car would be "safe." (*Id.*) Lockwood responded that they would be installed the next day but that Neubauer could park in a different location "in the meantime." (*Id.*; Lockwood Dep. at 119-22.) Winklevoss testified that he was fine having cameras put up in the parking lot and was of the opinion that based upon "probabilities" and as a "statistician," he would put a "high probability" that Kuo was keying cars in the company parking lot. (Winklevoss Dep. at 50-52.) When asked if circulating that type of suspicion and speculation through the workplace

was appropriate, Winklevoss responded that he "would have to think about that one." (*Id.* at 51-52.)

Neubauer testified that she told Lockwood and Antonelli her car was keyed and that she suspected Plaintiff did it "because we did not like each other. She was not happy with the company." (Neubauer Dep. at 21.) She further testified that she wanted management to be aware of her concerns that Plaintiff was obsessed with her. (Neubauer Dep. at 26-27.)

### 4. Final Written Warning

Following the staff meeting, Lockwood and Antonelli conferred with ADP, their outside human resources consultant, who advised them to give Plaintiff another disciplinary notice before terminating her.[15] (LR 56 Stmt. ¶ 58.) Accordingly, Lockwood issued the May 26, 2015 Counseling Record to Plaintiff which was marked as a "Final Written Warning." (Ex. 22 to Def.'s Mot. [Doc. # 50-9]; Pl.'s Dep. at 131-32.) Plaintiff refused to sign this write-up and testified that it was full of untruths. (Pl.'s Dep. at 124-27, 131-35.)

The Warning noted that Plaintiff was "calling around to other members of the staff to continue to discuss the disagreement in the Staff meeting" the day after the argument at the May 7 meeting. (*Id.*) Finally, the Warning noted:

> It has been brought to my attention that you are spreading unfounded rumors that I do not know what I am doing, you call me an 'idiot' to other members of the staff and that I make fictitious statements that you do all my work and I take the credit. This conduct is detrimental to our transparent work environment and is counter intuitive to the teamwork that is required of us to do the work that is required.

---

[15] After reviewing the information provided by Lockwood, ADP said that while "Winklevoss may still choose to move forward with the termination without the support of ADP TotalSource," such a decision may well affect insurance coverage. (Ex. 53 to Pl.'s Opp'n; Lockwood Dep. at 129-30.)

(*Id.*) Under "Improvement Required," the Warning said:

> You must refrain from any further outbursts of any kind to other members of the staff. Any communication other than work related day-to-day communications are strictly prohibited. . . . Any disparaging comments about any other members of the staff will not be tolerated and need to cease immediately. Any further misconduct will result in disciplinary action and possible termination of employment.

(*Id.*)

That same day, Plaintiff was given a one day decision-making leave. (LR 56 Stmt. ¶ 59.)

Lockwood sent Plaintiff an email providing the following:

> Take tomorrow (Wednesday 5/27) as a 'decision-making' leave for a day. This is so you can think about whether you want to continue on here as an employee or not. If you decide you want to continue, you need to prepare a letter for me convincing me that you will assume full and total responsibility for the perception problem that exists in terms of your conduct and behavior. You will need to convince me in writing that you recognize why there may be a perception problem and again convince me in writing that the problem will be fixed and that we will never have this discussion again. We will keep this letter out of your personnel file for now but with a clear understanding that if you violate the terms of your own agreement and commitment, that your signed document will be attached to any additional corrective action. Depending on the nature of the offense at the future point, there may not be any additional corrective action and you may simply end up firing yourself and putting an end to your career with us. We are considering this as a very serious exercise.

(Ex. 23 to Def.'s Mot.)

As requested, Plaintiff did not report to work on May 27, 2015 and drafted a statement. (LR 56 Stmt. ¶ 60.) In her statement, Plaintiff said that although she had "resided in this country for extensive period," "occasionally I use bad and negative English words by mistake" and apologizing for the tone of her complaints, as "there [is] a lot of corporate culture yet for [her] to learn." (Ex. 58 (Pl.'s Memo) to Pl.'s Opp'n [Doc. # 52-12].) The statement also acknowledged that Plaintiff "did

push too hard" regarding the "'argument' with Maria [Antonelli]" and that she "vented with certain unprofessional words and behaviors in the past" regarding the "unfounded rumors." (*Id.*)

### 5. *Termination*

Nonetheless, when Plaintiff reported to work on May 28, 2015, Mr. Lockwood met with her and notified her of her termination. (LR 56 Stmt. ¶ 61.) According to Antonelli, Plaintiff was terminated because when she received her Final Written Warning from Mr. Lockwood on May 26, 2015, she again raised her voice and had another loud and angry discussion with him, which ended with her storming out of his office. (Antonelli Dep. at 54-55, 79-81.) Antonelli testified that during that meeting, Plaintiff again became belligerent, she raised her voice and she yelled so loudly that Ms. Antonelli could hear her even though Mr. Lockwood's door was closed. (*Id.*) Plaintiff testified that she did not recall if she said anything during the meeting or if she raised her voice. (Pl. Dep. at 123-24, 131-32.)

Ms. Antonelli testified that she reported the situation to Mr. Winklevoss and described what she observed of Plaintiff's conduct on May 26 in response to receiving the Counseling Record. (Antonelli Dep. at 54-55, 79-81.) Mr. Winklevoss decided that termination was warranted, given Plaintiff's continued inappropriate behavior; he approved her discharge. Therefore, when she returned to work on May 28, 2015, Plaintiff was terminated for insubordination due to her continued outbursts in the workplace. (Antonelli Dep. at 91; Winklevoss Dep. at 41, 53-54; Lockwood Dep. at 8-9.)

The termination decision had been made by Winklevoss based solely upon information supplied by Antonelli. (Winklevoss Dep. at 40-41, 53-54; Lockwood Dep. at 8-11, 144-45; Antonelli Dep. at 79-81.) Winklevoss testified that Antonelli told him about "violent behavior in a conference room," but that he did not read any reports or do any investigation on his own, nor did he speak

with Lockwood. (Winklevoss Dep. at 42.) He testified Antonelli had not told him about Plaintiff's prior complaints, nor that a record was being created to justify termination, nor that ADP had issued an opinion that there was not a sufficient record to justify termination or to avoid a discrimination claim. (*See* Ex. 53, 56 to Pl.'s Opp'n; Winklevoss Dep. at 43, 56, 59-60.) Plaintiff's statement, prepared during her decision-making day, was never shared with Winklevoss, and Winklevoss was not aware that Lockwood had asked Plaintiff to draft such a statement. (*Id.* at 54-55, 60.)

Once Kuo was fired, Antonelli told employees not to talk to Kuo and gave out her phone number so people could avoid her if she called. (Antonelli Dep. at 81-82.) Most of Kuo's duties were picked up by Gonzalez, who was hired in late 2014, and by Neubauer. (Lockwood Dep. at 23; Neubauer Dep. at 15-16.) Neubauer and Gonzalez remain employed by Defendant and report to Lockwood. (Lockwood Dep. at 35-36.)

### H. Plaintiff's Criminal Convictions

In connection with her hire, Plaintiff completed an Employment Application. (Pl. Dep. at 10-11; Ex. 3. (Employment Application) to Def.'s Mot. [Doc. # 50-5]; LR Stmt. ¶ 66.) The Employment Application contained a criminal history inquiry. Plaintiff responded "No" to the first question: "Have you been convicted of a felony with the last seven years?" She also responded "No" to the second question: "Have you been convicted within the past seven years of misappropriation of funds, embezzlement or other dishonest conduct, an offense involving the use of a weapon, physical assault or other violent crimes?" (Employment Application; LR 56 Stmt. ¶ 67.)

An August 5, 2015 background check conducted in connection with this action revealed that Plaintiff had at least three misdemeanor convictions which she did not disclose on her

Employment Application, including two larceny convictions. (Winklevoss Aff. ¶ 3; *see also* Ex. 25 (Response re: Criminal History Record Request) to Def.'s Mot. [Doc. # 50-9].) On October 10, 2003, Plaintiff pled guilty to 6th degree larceny. On January 5, 2007, Plaintiff again pled guilty to 6th degree larceny. Plaintiff did not disclose these larceny convictions to the company in her employment application or afterward. (Pl.'s Dep. at 222-25; Response re: Criminal History Record Request; Ex. 26 (Pl.'s Resp. to Def.'s First Req. for Admission) to Def.'s Mot. [Doc. # 50-9] at ¶¶ 19-25; Ex. 27 (Case Look-Up) to Def.'s Mot. [Doc. #50-9]; Ex. 28 (Norwalk Police Dep't Case/Incident Report [Doc. # 50-9].) No Winklevoss employee has ever been terminated for being arrested or convicted of any misdemeanor. (Winklevoss Dep. at 64.) However, the employment application that Plaintiff submitted includes the following statement:

> I understand that any misrepresentations, omissions of facts . . . in any application document will disqualify me from further consideration for employment. I further understand that, if employed, any misrepresentations or omissions of fact in any application document will be cause for my dismissal at any time without prior notice."

(Employment Application.)

## II. Discussion

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case

will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

### A. Discrimination Claims (Counts One, Two, and Three)

Plaintiff's discrimination claims under Title VII, 42 U.S.C. § 1981, and CFEPA (Counts One, Two, and Three of the Complaint) are all subject to the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). To prevail on those claims, Plaintiff must first establish a prima facie case of discrimination. *See id*; *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981). Defendant must then proffer a legitimate, non-discriminatory reason for its decision to terminate Plaintiff. *See Burdine*, 450 U.S. at 252. If Defendant proffers such a legitimate non-discriminatory reason, then Plaintiff must prove that Defendant's claimed legitimate reason was pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

In considering a motion for summary judgment on claims subject to this framework, the Court must "examine the entire record to determine if" Plaintiff met her "ultimate burden of persuading the fact-finder of a central element of a 1981 claim: namely, that defendant[] intentionally discriminated against [her] on the basis of [her] race." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001). Whether summary judgment is appropriate here depends upon 'the strength of the plaintiff['s] prima facie case, the probative value of the proof that the [defendant's]

explanation is false, and any other evidence' that supports the defendants' case." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000).

### a. Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination, Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment decision; and (4) there exist circumstances which give rise to an inference of discrimination. *Burdine*, 450 U.S. at 252. The parties agree that Plaintiff has established the first three prongs of her prima facie case. (*See* Def.'s Mem. in Supp. Mot. for Summ. J. [Doc. # 50-1] at 22; Pl.'s Opp'n [Doc. # 52] at 15.)

Plaintiff argues that she has satisfied the fourth prong and established an inference of discrimination because: (1) her duties were taken over by employees outside her protected class (i.e. non-Asian employees); (2) Defendant's "singling out" of Plaintiff's communication skills suggests discrimination; (3) Plaintiff was similarly situated to but treated differently than Ms. Neubauer; and (4) Defendant did not investigate Plaintiff's complaints of unequal treatment. (Pl.'s Opp'n at 15-21.)

First, Plaintiff argues that "the mere fact that" she was "replaced by someone outside the protected class will suffice" to give rise to an inference of discrimination and meet her burden at the prima facie stage. (Pl.'s Opp'n at 15-16 (citing *Zimmerman Assocs. v. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).) Although this typically applies where a plaintiff is replaced by a newly-hired employee who is not a member of the protected class, it can also support an inference of discrimination where a plaintiff's responsibilities are taken over by existing employees who are not members of the protected class. *See Carlton v. Mystic Transp. Inc,* 202 F.3d 129, 135 (2d Cir. 2000) (finding inference of discrimination where plaintiff's "duties were transferred in part" and

"remaining duties were given to" two non-class members); *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989) (finding inference of discrimination where "majority" of plaintiff's "responsibilities were not eliminated, but were transferred to" a non-class member); *Fontecchio v. ABC Corp.*, No. 12-CV-6998 (CS), 2015 WL 327838, at *7 (S.D.N.Y. January 23, 2015) ("courts looking to a plaintiff's replacement as evidence of discrimination focus on the transfer of the plaintiff's job responsibilities, not assumption of his or her title"). Because, as Defendant admits, most of Plaintiff's duties were taken over by Neubauer and Gonzales, (Lockwood Dep. at 23; Neubauer Dep. at 15-16.), neither of whom is a member of Plaintiff's protected class, Plaintiff has demonstrated that she was terminated in circumstances which could give rise to an inference of discrimination.

Second, Plaintiff argues that Defendant's "singling out" of her communication skills gives rise to an inference of discrimination. (Pl.'s Opp'n at 16-17.) She argues that, because "her communications skills never resulted in a poor performance review," they are not a legitimate grounds for termination. (*Id.*) Defendant does not argue that Plaintiff's communication issues were grounds for termination, but merely that they were "accurate" and "not, as a matter of law, evidence of discrimination" because communication skills are "clearly tied to Plaintiff's ability to successfully perform the duties of her accounting position where precision and clarity are so important." (Def.'s Mem. at 26-27.)

> "Standing alone," a supervisor's reference to
>
> language deficiencies or accent is not evidence of discriminatory animus. 'An adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance. There is nothing improper about an employer making an *honest* assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance.

*Vidal v. Metro-North Commuter R. Co.,* No. 3:12-cv-00248 (MPS), 2014 WL 3868027, at *11 (D. Conn. August 6, 2014) (quoting *Fragante v. City & Cnty. Of Honolulu*, 888 F.2d 591, 596-97 (9th Cir. 1989)).

Here, Defendant repeatedly referenced Plaintiff's language deficiencies, and Plaintiff has offered no evidence that Defendant did so in a way that went beyond addressing material interference with job performance. Reviews of Plaintiff's performance frequently reiterated the "critical nature of communication," (*see, e.g.,* Pl.'s Performance Reports at DEF000037), or that "solid grammar is critical to our performance" and that Plaintiff needed to improve her communication "so that others can better understand her," (*see, e.g., id.* at DEF000244). Given Defendant's repeated focus on the importance of communication skills and the absence of any evidence suggesting that Defendant's comments were not tied to Plaintiff's material job performance, these comments do not give rise to an inference of discrimination.

Third, Plaintiff argues that she was similarly situated to but treated differently than Ms. Neubauer, further giving rise to an inference of discrimination. (Pl.'s Opp'n at 18-20.) Where two employees are "similarly situated" but treated differently, that differential treatment may give rise to an inference of discrimination. *See Mandell v. Cnty of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.")

Plaintiff contends that she and Ms. Neubauer were treated differently with respect to compensation and reviews, vacation time, work-from-home days, and education reimbursement. Defendant argues that Plaintiff and Ms. Neubauer were not treated differently, and to the extent there were any differences in treatment, those differences occurred because Plaintiff and Ms. Neubauer were not similarly situated. (Def.'s Mem. at 28-31.)

Plaintiff contends that Ms. Neubauer "consistently received larger annual salary increases and larger annual bonuses" than Ms. Kuo, "despite Plaintiff's seniority." (Pl.'s Opp'n at 18.) Kuo and Neubauer were both employed by Defendant and received year-end raises for the years 2007 through 2014. During 2007 and 2008, Plaintiff received a larger salary increase than did Ms. Neubauer. From 2009 to 2014, Ms. Neubauer did receive a larger salary increase than Plaintiff. Plaintiff received a larger bonus than Ms. Neubauer in 2008 and 2012, the same bonus as Ms. Neubauer in 2010 and 2011, and a smaller bonus than Ms. Neubauer in 2009, 2013, and 2014. This comparison demonstrates that Plaintiff in fact did not "consistently receive" smaller bonuses than Ms. Neubauer.

To the extent that Plaintiff did receive smaller salary increases than Ms. Neubauer, Defendant argues that difference was because the two employees were not similarly situated. First, during her employment with Defendant, Ms. Neubauer achieved a Master's degree and obtained her CPA qualification. (Neubauer Dep. at 11-12.) Though Plaintiff took classes during her employment, she obtained neither an advanced degree nor her CPA qualification. This alone suggests that Plaintiff and Ms. Neubauer were not similarly situated. Moreover, Ms. Neubauer received more consistently high (5 / Outstanding) scores on her annual evaluations than did Plaintiff. Although Plaintiff argues that these scores themselves were the product of discrimination, she offers no evidence to that effect. Importantly, "it is not this Court's role to second-guess [an employer's] evaluation of [an employee.]" *Betterson v. HSBC Bank, USA, NA*, 139 F. Supp. 3d 572, 589 (W.D.N.Y. 2015) (modifications in original) (quoting *Pawlowski v. Unified Court Sys.*, No. 12-CV-208S, 2014 WL 2453110, at *5 (W.D.N.Y. June 2, 2014). Insofar as Plaintiff and Ms. Neubauer were compensated differently, Plaintiff has not offered any evidence which creates a genuine dispute as to whether those two employees were similarly situated.

Plaintiff also contends that she and Ms. Neubauer were treated differently with respect to vacation time. Despite Plaintiff's belief that Ms. Neubauer received more vacation time than plaintiff during 2010 and 2011 (four weeks for Ms. Neubauer vs. three weeks for Plaintiff), there is no evidence in the record to support that belief. In fact, the record shows that both employees officially received only three weeks of vacation per year until 2012, at which point both received four weeks per year. (*See* Updated Employee Policies Email). Additionally, Lockwood never denied any of Plaintiff's requests to use vacation time, (Pl.'s Dep. at 186-88, 190-91, 195), and even allowed Plaintiff to take four weeks of vacation at once by combining personal days with vacation days and making up other days. (*See id.* at 190-91; Email re: vacation time.) Plaintiff has not offered any evidence which creates a genuine dispute as to whether she received less vacation time than Ms. Neubauer.

Plaintiff also contends that she and Ms. Neubauer were treated differently with respect to work-from-home days. However, like compensation and vacation time, the evidence in the record does not support this assertion. Though the work-from-home schedule was initially dependent upon Ms. Neubauer's preferences, this changed to an equal rotation of selecting days once Plaintiff expressed her desire for that change; thereafter, Plaintiff, Neubauer, and Gonzales rotated who got to choose days first. (LR 56 Stmt. ¶ 16; Neubauer Dep. at 39-41; *see also* Working From Home Emails.) Importantly, this schedule was determined among those three employees and was not regularly overseen by any management-level employees of Defendant. (Lockwood Dep. at 66:21-67:1.) Finally, though Plaintiff felt that this arrangement was "unfair" and that Ms. Neubauer worked from home more frequently than she did, (Pl.'s Dep. at 87, 159-60), the evidence in the record shows only that Plaintiff and Ms. Neubauer worked from home roughly the same number of days per week. (*See* Work Calendar.)

Finally, Plaintiff contends that she and Ms. Neubauer were treated differently with respect to reimbursement for education expenses. Here again, the evidence in the record does not indicate any differential treatment. In 2009 and 2010, Defendant reimbursed Plaintiff for $16,192 in schooling expenses. (Pl.'s 2010 Performance Report.) As a result, Plaintiff's 2010 bonus was reduced to $2,500. (*Id.*) Defendant paid for all expenses associated with Plaintiff preparing for the CPA exam. (LR 56 Stmt. ¶ 28.) In contrast, Defendant declined to reimburse Ms. Neubauer for the review materials and testing expenses for her CPA exam, though it did reimburse other of her educational expenses. (Neubauer Dep. at 11-12.) Like Plaintiff, Neubauer's 2010 bonus was also reduced to $2,500 due to tuition reimbursement payments. (*Id.* at 37-38; Neubauer 2010 Performance Report.) Plaintiff has not proffered any evidence which creates a genuine dispute as to whether she was treated differently than Ms. Neubauer with regard to educational reimbursements.

Fourth, Plaintiff argues that Defendant's alleged failure to investigate Plaintiff's complaints gives rise to an inference of discrimination. "[A]n employer's response to an allegation of discrimination *itself* [can] constitute[] evidence of discrimination. . . When employees complain of Title VII violations, for example, employers can be held liable if they do not fulfill their duty to take reasonable steps to remedy the violation." *Sassaman v. Gamache*, 566 F.3d 307, 314 (2d Cir. 2009) (emphasis in original) (internal quotations omitted). However, as discussed below at (II)(B), Plaintiff never made a recognizable complaint of illegal employment discrimination. Therefore, Defendant's alleged failure to investigate her complaints does not give rise to an inference of discrimination.

### b. Defendant's Legitimate Non-Discriminatory Reason

Because Plaintiff has met her minimal burden at the prima facie stage, Defendant must offer a legitimate, non-discriminatory reason for its decision to terminate her employment. *See Burdine,* 450 U.S. at 252. In support of its decision to terminate Plaintiff, Defendant cites Plaintiff's "documented history of explosive, angry conduct in the workplace" and Plaintiff's "history of raising her voice and yelling in the workplace." (Def.'s Mem. at 32.) There is an abundance of evidence in the record as to Plaintiff's behavior in the workplace and Defendant's documentation thereof. (*See supra* at I(F)-(G).) Plaintiff does not contest that Defendant has met its burden of proffering a legitimate non-discriminatory reason for her termination. (*See generally* Pl.'s Opp'n.)

### c. Plaintiff's Showing of Pretext

Where Plaintiff has made a prima facie showing of discrimination and Defendant has proffered a legitimate non-discriminatory reason for the adverse employment action, Plaintiff must show that the employer's claimed reason was pretext for discrimination in order to prevail on her claims. *See Burdine,* 450 U.S. at 252. To survive a motion for summary judgment, there must be a genuine dispute of material fact upon which a reasonable jury could find in Plaintiff's favor, i.e. that the Defendant's claimed reason was pretextual. *See Williams,* 453 F.3d at 116.

Plaintiff offers several additional arguments at the pretext stage. First, Plaintiff argues that the "timing of events supports a finding of pretext." (Pl.'s Mem. at 23.) She argues that the "sequence of events leading up to plaintiff's termination supports a finding that the decision to terminate plaintiff had been made long before the May 7, 2015 staff meeting," which in turn "supports finding that defendant concocted a discriminatory plan to justify plaintiff's unlawful termination." (*Id.*) The evidence in the record certainly indicates that Defendant was growing frustrated with Plaintiff's behavior prior to the May 7 meeting, but Plaintiff points to no evidence which would support a conclusion that Defendant had already decided to terminate her prior to

that meeting. (*See generally id.*) Indeed, the evidence in the record supports the opposite conclusion. Although Antonelli testified that she and Lockwood discussed the possibility of terminating Plaintiff in February 2015, (Antonelli Dep. at 55), Defendant only escalated its responses to Plaintiff's behavior to the level of a "Final Written Warning" weeks after the May 7 meeting. (*See* Final Written Warning.) Defendant even provided concrete guidance as to the steps Plaintiff should take to improve her job performance during the months leading up to her termination. (*See* 2/17/15 Counseling Record.)

Second, Plaintiff argues that "[i]nconsistent descriptions of meetings upon which the termination was based" supports a finding of pretext. (Pl.'s Opp'n at 24.) Plaintiff argues that, because "Lockwood's contemporaneous memorandum outlining the events of the May 7, 2015" meeting does not mention an "outburst," it is inconsistent with the affidavits and deposition testimony which outline her behavior at the May 7 meeting. (*Id.*) Plaintiff further argues that the lack of "immediate disciplinary action taken" against her following that meeting suggests that the severity of the May 7 incident has been overstated for purposes of this litigation. (*Id.*)

Plaintiff notes correctly that the evidence in the record from the time immediately following the May 7 meeting does not include the level of detail about Plaintiff's behavior at that meeting as do the affidavits and depositions prepared for this litigation. However, that evidence does not contradict the many affidavits and depositions. On May 8, the day after the meeting, Lockwood wrote to Antonelli regarding the "unsafe environment" which he did not wish to impose on the other staff members. (Ex. 44 to Pl.'s Opp'n.) A May 8 email from Lockwood to Plaintiff with the subject "Yesterday's incident" referred vaguely to "what happened yesterday." (Ex. 41 (Pl.'s Aff) to Pl.'s Opp'n.) A May 8 email from ADP to Lockwood about Plaintiff referenced a "[s]taff [m]eeting [i]ncident" which Lockwood had contacted ADP about and discussed the appropriate

disciplinary measures in response to that incident. (Ex. 53 to Pl.'s Opp'n.) Lockwood also drafted a version of what eventually became Plaintiff's Final Written Warning as early as May 13, 2015, just six days after the May 7 meeting. That draft stated that Plaintiff "continued to argue" with Antonelli "for several minutes" and "began to raise [her] voice" which was "not professional behavior." (Ex. 54 to Pl.'s Opp'n.) That Defendant did not acquire detailed affidavits or testimony regarding this incident until after the start of litigation does not support a finding of pretext.

Finally, Plaintiff argues that Defendant's failure to follow disciplinary policy supports a finding of pretext. (Pl.'s Opp'n at 24-25.) Plaintiff argues correctly that Defendant did not heed the advice of ADP, its outside HR consultant, who recommended giving Plaintiff one more chance beyond the May 26 Final Written Warning. (LR 56 Stmt. ¶ 61; Pl. Dep. at 123-24, 131-32.) Even in the context of discrimination allegations, courts are reluctant to impose their judgment in place of an employer's business decisions. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("To begin with, it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal. . . . The distinction lies between a poor business decision and a reason manufactured to avoid liability.") Absent other evidence of pretext or any basis in the record to suggest that Defendant's decision to terminate Plaintiff, however hasty it may have been, was motivated by discrimination, the Court declines to second-guess Defendant's decision to terminate Plaintiff when it did.

Plaintiff also offers her arguments from the prima facie stage in support of her contention that Defendant's claimed reason was pretextual. Plaintiff may demonstrate pretext "by reliance on the evidence that established her prima facie case, without any additional evidence being required." *Gall v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1226 (2d Cir. 1994). However, where, as here, a plaintiff's prima facie case is very "weak," that evidence may not be

sufficient to support a finding of pretext. *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998) (holding that a "very weak prima facie case," based only on the decision-maker's non-membership in the protected class, "combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough" to support a jury finding in plaintiff's favor).

Though Plaintiff advanced many arguments at the prima facie stage, she successfully established a prima facie case of discrimination only by showing that her duties were taken over by non-members of her protected class. She has not created a genuine dispute of material fact at the pretext stage of the burden-shifting framework. Although Defendant may have acted hastily, unwisely, or even unfairly, no reasonable jury could find that Defendant's behavior was motivated by racial discrimination based on the record currently before the Court. *See Lizardo*, 270 F.3d 102 ("Although mistreatment by defendants is not irrelevant in assessing the strength of plaintiffs' circumstantial evidence of race-based animus, it is certainly not sufficient to establish it. We can envision many circumstances where markedly hostile treatment, even in a purportedly service-oriented industry, would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility.") Therefore, Defendant's Motion for Summary Judgment will be granted as to Counts One, Two, and Three of the Complaint.

**B. Retaliation Claims (Counts Four, Five, and Six)**

Plaintiff's discrimination claims under Title VII, 42 U.S.C. § 1981, and CFEPA (Counts Four, Five, and Six of the Complaint) are also subject to the burden-shifting framework of *McDonnell Douglas*. *See Littlejohn v. City of New York*, 795 F. 3d 297, 315 (2d Cir. 2015). To prevail on those claims, Plaintiff must first establish a prima facie case of retaliation. To establish that prima facie case, Plaintiff must show that: (1) she participated in a protected activity; (2) Defendant

knew of the protected activity; (3) she suffered an adverse employment action; and (4) a causal connection exists between her protected activity and the adverse employment action. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). If Plaintiff establishes a prima facie case of retaliation, Defendant must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Finally, if Defendant does so, then Plaintiff must establish that retaliation was a "substantial reason" for the adverse employment decision. *Id.*

Defendant argues that Plaintiff has failed to make her prima facie case of retaliation, or even to create a genuine dispute of material fact as to that prima facie case, because there is no evidence in the record to suggest that Plaintiff engaged in the required "protected activity" of which Defendant was aware. (Def.'s Mem. at 35.) Defendant points to Plaintiff's own deposition testimony, in which she confirms that she never mentioned or referred to race or national origin in her discussions with Lockwood. (Pl. Dep. at 64-67.) Plaintiff testified that she complained that she was being treated "unfairly," but purposely "did not mention" race: "Of course I'm not going to pinpoint because I'm Asian or something like that. All I say is, Mark, I feel I've been treated very unfair." (*Id.* at 66.)

Plaintiff argues that these statements—referring to unfair treatment without any mention of race or national origin—constituted protected activity of which Defendant knew. (Pl.'s Opp'n at 27-29.) Although employees are not required to use legally operative terms to raise a cognizable complaint of discrimination to their employer, Plaintiff must submit some evidence on which a jury could find that she was engaging in protected conduct. *See Rosioreanu v. City of New York*, 526 F. App'x. 118, 120 (2d Cir. 2013) (finding no protected activity of which employer was aware where employee had not explicitly referred to gender or sex in complaints, no "quintessentially gender-based conduct" was involved, and employee's complaints "could easily have described a

conflict of co-workers of any sex—regardless of the presence or absence of discriminatory absence"); *Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x. 26, 28 (2d Cir. 2013) ("Nor does Fattoruso's belief that he was being treated "unfairly" transform his complaints to [defendant] into charges over unlawful discrimination. As Fattoruso's complaints were limited to expressing his dismay over 'favoritism with one of the employees,' [defendant] cannot be expected to have understood Fattoruso to have been complaining about disparate treatment based on sex and therefore engaging in protected activity.").

Given the absence of any reference or allusion to race or national origin in Plaintiff's complaints to Defendant and Plaintiff's own testimony that she intentionally did not make any such references when complaining of "unfair" treatment, no reasonable jury could find that Plaintiff was engaging in protected activity based on the record currently before the Court. Therefore, Plaintiff has not established any genuine dispute as to her prima facie case of retaliation, and Defendant's Motion for Summary Judgment will be granted as to counts Four, Five, and Six of the Complaint.

### C. Defendant's Affirmative Defense

Because the Court grants Defendant's Motion for Summary Judgment on all counts, it does not address the parties' arguments regarding Defendant's affirmative defense of after-acquired evidence.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 50] is GRANTED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of September 2018.